Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| NICOLE MARIE RODRÍGUEZ OTERO Y YAMIL RODRÍGUEZ RIVERA, POR SÍ Y EN REPRESENTACIÓN DE SU HIJA MENOR DE EDAD, ALANA SOFÍA RODRÍGUEZ RODRÍGUEZ<br><br>Apelantes<br><br>v.<br><br>PUERTO RICO WOMEN AND CHILDREN'S HOSPITAL, LLC.; DRA. MARÍA DEL PILAR RAMÍREZ MUÑIZ, POR SÍ Y EN REPRESENTACIÓN DE LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA JUNTO A SUJETO "A"; DR. EDUARDO OCHOA BACALLAO, POR SÍ Y EN REPRESENTACIÓN DE LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA JUNTO A SUJETO "B"; DRA. GLORIMAR SALCEDO MÁRTIR, POR SÍ Y EN REPRESENTACIÓN DE LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA JUNTO A SUJETO "C"; DRA. MARÍA P. CASADO GARCÍA, POR SÍ Y EN REPRESENTACIÓN DE LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA JUNTO A SUJETO "D"; DRA. MARAN Y. HERNÁNDEZ RODRÍGUEZ, POR SÍ Y EN REPRESENTACIÓN DE LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA JUNTO A SUJETO "E"; DRA. YASHIRA M. TORRES RAMÍREZ, POR SÍ Y EN REPRESENTACIÓN DE LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA JUNTO A SUJETO "F"; DR. RODRÍGUEZ, POR SÍ Y EN REPRESENTACIÓN DE LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA JUNTO A SUJETO "G"; PUERTO RICO MEDICAL DEFENSE INSURANCE COMPANY; MEDPRO GROUP, INC.; SERVICIOS NEONATALES | KLAN202500375 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Caso número: BY2021CV01363<br><br>Sobre: Daños y perjuicios; impericia médica |

Número Identificador

SEN2025 _____

| GUAILÍ, CSP; Y SU ASEGURADORA "ABC"; SOCIEDAD DE SERVICIOS NEONATALES DE ARECIBO, PSC; Y SU ASEGURADORA "DEF"; MTG PEDIATRIC GROUP, PSC; Y SU ASEGURADORA "HGI"; SUJETOS "A", "B" "C", "D", "E", "F", "G"; CORPORACIONES "X", "Y" Y "Z"; ASEGURADORAS "A", "B", "C", "D", "E", "F", "G", "H" | | |
|---|---|---|
| Apelados | | |

Panel integrado por su presidenta, la jueza Ortiz Flores, la juez Aldebol Mora y la jueza Boria Vizcarrondo.

Aldebol Mora, Juez Ponente

# SENTENCIA

En San Juan, Puerto Rico, a 27 de agosto de 2025.

Comparece la apelante, Nicole Marie Rodríguez Otero y Yamil Rodríguez Rivera[1] (Rodríguez-Rodríguez o apelante) y solicita que revoquemos la *Sentencia* emitida el 10 de febrero de 2025, notificada el 13 del mismo mes y año, por el Tribunal de Primera Instancia, Sala Superior de Bayamón. Mediante el referido dictamen, el TPI declaró con lugar las solicitudes de desestimación y sentencia sumaria presentadas por la apelada y desestimó, con perjuicio, la demanda incoada por Rodríguez-Rodríguez.

Por los fundamentos que expondremos a continuación, se confirma la sentencia apelada.

I.

El 8 de abril de 2021[2], la parte apelante presentó una demanda sobre daños y perjuicios por impericia médica en contra de varios demandados, a saber: Puerto Rico Women and Children's Hospital, LLC. (Hospital), la Dra. María del Pilar Ramírez Muñiz (Dra. Ramírez), el grupo médico MTG Pediatric Group, PSC (MTG), el Dr.

---

[1] Ambos por sí, y en representación de su hija menor de edad, Alana Sofía Rodríguez-Rodríguez.
[2] Véase, *Ap. 7-Demanda,* Apéndice del recurso, págs. 107-117.

Eduardo Ochoa Bacallao (Dr. Ochoa), la Dra. Glorimar Salcedo Martir (Dra. Salcedo), la Dra. María P. Casado García (Dra. Casado), la Dra. Marán Yelitza Hernández Rodríguez (Dra. Hernández), la Dra. Yashira M. Torres Ramírez (Dra. Torres), Puerto Rico Medical Defense Insurance Co. (PRMDIC)[3] y Medpro Group (Medpro), Servicios Neonatales Guailí, PSC (SNG) y Servicios Neonatales Arecibo (SNA)[4], (en conjunto los demandados o apelada). En síntesis, Rodríguez-Rodríguez alegó que el 23 de octubre de 2020, llevó a su hija menor de edad, Alana Sofía Rodríguez Rodríguez (Alana), a la Sala de Emergencias del Hospital con un cuadro grave de tos y problemas respiratorios. La menor estuvo en cuidado intensivo pediátrico (PICU por sus siglas en inglés) y falleció el 1 de noviembre de 2020, ante la alegada negligencia de los demandados en su diagnóstico y tratamiento. Por lo anterior, Rodríguez-Rodríguez reclamó una indemnización por los daños y perjuicios sufridos por Alana y por los sufrimientos y angustias de Rodríguez-Rodríguez por la muerte de su hija.

Luego de varias incidencias procesales, el 8 de septiembre de 2021, Rodríguez-Rodríguez presentó *Moción Informativa, Solicitud de Des[i]stimiento Sin Perjuicio y Solicitud de Orden*[5], en la que solicitó el desistimiento sin perjuicio en cuanto a la Dra. Hernández, la Dra. Torres y la Dra. Salcedo. El 9 de septiembre de 2021, notificada el 10 del mismo mes y año, el TPI emitió *Sentencia Parcial*[6] de desistimiento sin perjuicio en cuanto a éstas.

---

[3] Conforme surge del expediente en SUMAC, la aseguradora PRMDIC expidió pólizas de responsabilidad profesional a nombre de la Dra. Ramírez, el Dr. Ochoa y la Dra. Casado. (Véase Entrada Núm. 161 de SUMAC).

[4] El 27 de septiembre de 2021, Rodríguez-Rodríguez solicitó autorización para presentar *Segunda Demanda Enmendada* a los fines de añadir a PRMDIC, quien ya figuraba como codemandada, como aseguradora del Dr. Ochoa y la Dra. Ramírez y añadir a los codemandados SNA, MTG, SNG y sus respectivas aseguradoras. En esa misma fecha, el TPI autorizó la segunda demanda enmendada. (Véase, Entradas Núm. 159, 160 y 161 SUMAC.)

[5] Véase, Entrada Núm. 145 del Sistema Unificado de Manejo y Administración de Casos (SUMAC).

[6] Entrada Núm. 148 de SUMAC.

Por otro lado, el 7 de febrero de 2022, Rodríguez-Rodríguez radicó una *Moción de Desistimiento Parcial por Estipulación*[7]. En esta expuso que suscribió un documento intitulado *Estipulación Parcial y Acuerdo Privado de Transacción y Relevo Total*[8] (Acuerdo Privado de Transacción) con la Dra. Ramírez, su aseguradora PRMDIC y MTG. Por ello, Rodríguez-Rodríguez solicitó el desistimiento con perjuicio en cuanto a los codemandados antes mencionados. El 7 de febrero de 2022, notificada el 8 de igual mes y año, el foro primario emitió *Sentencia Parcial*[9] de desistimiento con perjuicio en cuanto a la Dra. Ramírez, PRMDIC como su aseguradora y MTG.

Luego, el 3 de marzo de 2022, Rodríguez-Rodríguez presentó *Desistimiento Parcial*[10], en la que solicitó el desistimiento con perjuicio en cuanto a SNA. Al día siguiente, el TPI emitió *Sentencia Parcial*[11] de desistimiento con perjuicio en cuanto a SNA. Emitidas las referidas sentencias parciales, quedaban como demandados en el pleito la Dra. Casado, el Dr. Ochoa, SNG y PRMDIC como aseguradora de éstos; el Hospital y MEDPRO como su aseguradora.

Así las cosas, el 31 de enero de 2023, la Dra. Casado y su aseguradora PRMDIC presentaron una *Moción Solicitando Desestimación y/o Sentencia Sumaria por Falta de Prueba Pericial en contra del Compareciente*[12]. En síntesis, expusieron que Rodríguez-Rodríguez anunció como perito a la Dra. Mayra Domínguez (Dra. Domínguez), quien rindió un Informe Pericial (Informe) el 24 de abril de 2021[13]. Añadieron que los demandados que quedaban en el pleito le tomaron una deposición a la Dra. Domínguez el 10 de octubre de 2022. Arguyeron que, en el Informe Pericial y en la deposición

---

[7] Entrada Núm. 260 de SUMAC.
[8] No se acompañó el *Acuerdo Privado de Transacción.*
[9] Entrada Núm. 263 de SUMAC.
[10] Entrada Núm. 287 de SUMAC.
[11] Entrada Núm. 289 de SUMAC.
[12] Apéndice del recurso, págs. 246-321.
[13] Junto con la solicitud de desestimación y/o sentencia sumaria, la Dra. Casado y PRMDIC acompañaron el informe rendido por la Dra. Domínguez (Anejo 1).

tomada a la perita, no surgen imputaciones periciales de negligencia en contra de la Dra. Casado. Por ello, alegaron que no existía controversia de que Rodríguez-Rodríguez carecía totalmente de prueba pericial en contra de la Dra. Casado, por lo que procedía se dictara sentencia desestimatoria por la vía sumaria, con perjuicio, en cuanto a ésta y su aseguradora PRMDIC.

Por su parte, el 1 de febrero de 2023, el Dr. Ochoa y su aseguradora PRMDIC presentaron *Moción de Sentencia Sumaria*[14]. En esta, expusieron que el Informe Pericial y la deposición tomada a la Dra. Domínguez, no contienen imputaciones de negligencia en contra del Dr. Ochoa, por lo que procedía la desestimación de la demanda, con perjuicio, en cuanto a éste y su aseguradora.

El 2 de febrero de 2023, Rodríguez-Rodríguez solicitó término[15] para presentar su oposición a las mociones presentadas por la Dra. Casado, el Dr. Ochoa y PRMDIC. El 3 de febrero de 2024, el TPI concedió el término solicitado[16].

Entonces, el 6 de febrero de 2023, SNG presentó *Moción Informativa Adoptando Moción de Sentencia Sumaria y Moción de Desestimación Radicadas por Codemandados*[17]. En resumen, SNG adoptó como suyos, por referencia, las mociones presentadas por la Dra. Casado y el Dr. Ochoa. Basó su posición en el hecho de que su responsabilidad respecto a los doctores Casado y Ochoa es vicaria. Por consiguiente, SNG arguyó, que, ante la ausencia de prueba pericial en contra de los referidos doctores, no procedía que le impusieran responsabilidad.

Entretanto, el 19 de diciembre de 2023, Rodríguez-Rodríguez presentó una *Moción de Desistimiento Parcial con Perjuicio al Amparo*

---

[14] Véase, Apéndice 18, págs. 322-520.
[15] *Moción Informativa y Solicitando Extensión de Término,* Apéndice 19, págs. 521-525.
[16] *Orden,* Apéndice 20, pág. 526.
[17] Apéndice 21, págs. 527-528.

*de la Regla 39.1(a)(2)*[18]. En esta, expuso que suscribió *Estipulación y Acuerdo de Transacción Parcial de Desistimiento con Perjuicio y Relevo* con el Hospital y Medpro. El 25 de enero de 2024, notificada al día siguiente, el TPI emitió *Sentencia Parcial*[19] de desistimiento con perjuicio en cuanto al Hospital y Medpro. Así, quedaron como demandados en el pleito la Dra. Casado, el Dr. Ochoa, SNG y PRMDIC como aseguradora de éstos.

Así las cosas, el 13 de febrero de 2024, el Dr. Ochoa y su aseguradora PRMDIC presentaron una segunda solicitud de sentencia sumaria, titulada *Moción de Sentencia Sumaria Solicitando Aplicación de la Ley 136-2006, Centros Médicos Regionales*[20]. En esta, argumentaron que el Hospital cuenta con un Centro Académico Regional (CMAR) establecido de conformidad con la *Ley de los Centros Médicos Académicos Regionales*[21]. Añadieron que el Dr. Ochoa tiene un nombramiento *Ad Honorem* como *Assistant Professor* de la Escuela de Medicina de Ponce desde el año 2012 y el Hospital opera el CMAR con un acuerdo de afiliación con dicha escuela. Alegaron que el Dr. Ochoa atendió a Alana acompañado de médicos residentes como parte de sus funciones docentes en el Hospital. Por consiguiente, arguyeron que al Dr. Ochoa le cobijaba la inmunidad conferida por las disposiciones de la Ley 136-2006, *supra,* y la *Ley de Reclamaciones y Demandas contra el Estado*[22]. Por ello, sostuvieron que no existe controversia real de hechos que impidiera la resolución sumaria de la controversia. Por lo anterior, solicitaron que, por las disposiciones de la Ley 136-2006, *supra,* procedía determinar que al Dr. Ochoa le aplicaban los límites dispuestos en la Ley 136-2006, *supra*, y la Ley 104-1955, *supra*.

---

[18] Entrada Núm. 410 de SUMAC.
[19] Entrada Núm. 421 de SUMAC.
[20] Apéndice 24, págs. 533-671.
[21] Ley Núm. 136 de 27 de julio de 2006, según enmendada. 24 LPRA § 10031 *et seq.*
[22] Ley Núm. 104 de 29 de junio de 1955, según enmendada. 32 LPRA § 3077 *et seq.*

Por otra parte, SNG también presentó una segunda *Moción Solicitando Sentencia Sumaria*[23]. En esta, SNG alegó, que Rodríguez-Rodríguez había recibido la suma de $825,000.00 por motivo de los acuerdos transaccionales suscritos con varios codemandados que quedaron fuera del pleito mediante las sentencias parciales correspondientes. En vista de ello, arguyeron que, a su entender, los demandantes han recibido una compensación justa y adecuada. Por último, señalaron que no procedía imponerles responsabilidad porque ésta solo podía ser responsable de forma vicaria por la negligencia de los doctores Casado y Ochoa; así como tampoco procedía imponerles responsabilidad por la negligencia de la Dra. Ramírez, GMT ni el Hospital.

En respuesta, Rodríguez-Rodríguez presentó las oposiciones a las mociones dispositivas presentadas por los apelados[24]. En síntesis, Rodríguez-Rodríguez reconoció que, aunque su perito admitió que no había causa de acción contra la Dra. Casado y el Dr. Ochoa, luego de que se rindiera el Informe Pericial, se les tomó una deposición a los doctores el 31 de agosto de 2023. La apelante expuso que, de dichas deposiciones surgen elementos que demostraban que la Dra. Casado y el Dr. Ochoa fueron negligentes. Añadió que, conforme resuelto por la jurisprudencia, en casos en que de los hechos surja la negligencia de forma obvia, no era necesario presentar prueba pericial sobre ésta. Por tanto, sostuvo que los elementos que surgen de las deposiciones tomadas demostraban que la Dra. Casado y el Dr. Ochoa habían sido negligentes. En cuanto a la alegación de inmunidad del Dr. Ochoa bajo la Ley 136-2006, *supra,* Rodríguez-Rodríguez argumentó que dicha inmunidad le aplicaba como profesor cuando actuaba en

---

[23] Apéndice 25, págs. 672-697.
[24] Véase, *Oposición a Moción Solicitando Desestimación y/o Sentencia Sumaria por Falta de Prueba Pericial en Contra del Compareciente,* presentada el 23 de febrero de 2024 Apéndice 27, págs. 700-1182; y el 19 de marzo de 2024. Apéndice 28, págs. 1183-1589 y Apéndice 29, págs. 1590-1617.

cuestiones de educación; no cuando daba servicios en un hospital. Sobre el particular, añadió que era necesario señalar una vista evidenciaria para determinar si éste estaba ejerciendo funciones educativas o solo médicas. Por último, en cuanto a SNG, expresaron que no procedía que la entidad quedara fuera del pleito, pues ésta responde vicariamente por la negligencia de los doctores Casado y Ochoa.

Mediante *Orden*[25] emitida y notificada el 27 de febrero de 2024, el TPI no permitió más escritos en réplica y dio el caso por sometido.

El 10 de febrero de 2025, notificada el 13 del mismo mes y año, el TPI emitió la *Sentencia*[26] apelada. En esta, el foro primario emitió las siguientes determinaciones de hecho:

1. La Demanda en el caso de epígrafe fue presentada el 8 de abril de 2021 por Nicole Marie Roríguez Otero y Yamil Rodríguez Rivera en contra del PRWCH, Dra. Ramírez, Dr. Ochoa, Dra. Glorimar Salcedo Mártir, Dra. Casado, Dra. Maran Yelitza Hernández Rodríguez, Dra. Yashira M. Torres Ramírez, Dr. Rodríguez, entre otros codemandados.

2. Luego de varios incidentes procesales, se presentó la Segunda Demanda Enmendada el 27 de septiembre de 2021 y permanecen como codemandados en el pleito el Dr. Ochoa, la Dra. Casado, Servicios Neonatales Guaili, CSP, PRMDIC como aseguradora de éstos, PRWCH y Medpro como aseguradora del PRWCH.

3. En resumen, en la demanda, según enmendada, se alega que la Sra. Nicole Rodríguez acudió con su hija Alana al PRWCH el 23 de octubre de 2020. Se alega que el tratamiento ofrecido en Sala de Emergencias fue inadecuado, que la menor sufrió un arresto cardiorrespiratorio, que la menor fue resucitada y admitida a la Unidad de Cuidados Intensivos Pediátricos ("PICU" por sus siglas en inglés "Pediatric Intensive Care Unit") y que ahí no se brindó tratamiento adecuado para salvarle la vida, falleciendo ésta el 1 de noviembre de 2020.

4. En cuanto al Dr. Ochoa, se alegó:

---

[25] Apéndice 31, pág. 1620. Véase, además, Apéndices 32 al 26, págs. 1621 a la 1857.
[26] Apéndice 1, págs. 1-20.

    a. Que estuvo a cargo del proceso de intubación de la menor, el cual se alega fue "totalmente deficiente y tardío".

    b. Que fue "tardíamente" admitida a PICU bajo el cuidado del Dr. Ochoa y la Dra. Glorimar Salcedo Mártir.

    c. Que enmendó el Certificado de Defunción para incluir "otros diagnósticos médicos" que "no habían sido declarados" en el Certificado de Defunción original.

    d. Que durante el proceso de intubación el Dr. Ochoa "perforó un pulmón" a la menor.

5. **En la alegación número 46 de la Segunda Demanda Enmendada es que se menciona por primera vez a la Dra. María P. Casado García** en conjunto con otros médicos allí nombrados alegando en síntesis que la menor había sufrido **un segundo arresto cardio respiratorio en PICU** y que recuper[ó] los pulsos a los 13 minutos de esfuerzos de reanimación. Que le hicieron placa de pecho que demostró neumotórax izquierdo y que requirió tubo de pecho siendo tratada por la Dra. Casado, Dra. Rodr[í]guez y Dra. Yashira Torres, y que debieron reconocer que la colocación del tubo de pecho fue tardía y no le brindaron a tiempo el tratamiento que hubiese salvado la vida de Alana.

6. En la alegación número 47 se alega que Dra. Casado y Dra. Hernández anotaron que Alana sufrió convulsiones, episodios que continuaron a pesar de la administración de medicación anticonvulsiva, y que estas debieron reconocer que el tratamiento ya resultaba demasiado tardío, por lo que fueron negligentes al no br[i]ndarle a tiempo tratamiento adecuado que le hubiera salvado la vida.

7. Únicas dos instancias que menciona y se hace alegación en contra de la Dra. Mar[í]a P. Casado en la Segunda Demanda Enmendada, aunque en las alegaciones de daños alega que los codemandados todos son responsables de los mismos.

8. La parte demandante contrató los servicios de la Dra. Mayra Domínguez, Pediatra, para que le sirviera como perito en el caso. Esta rindió su informe pericial con fecha de 24 de abril de 2021. [Exhibit 1 de la Solicitud de Sentencia Sumaria del Dr. Ochoa, Informe pericial de la Dra. Domínguez.]

9. En dicho informe pericial, se menciona al Dr. Ochoa solo en dos ocasiones:

    a. "Resuscitative efforts were undertaken, and whe was endotracheally intubated by Dr. Eduardo Ochoa Bacallao."

    b. "Alana was admitted to the Pediatric Intensive Care Unit under the care of Drs. Eduardo Ochoa Bacallao and Glorimar Salcedo Martir."

10. **En el informe pericial de la Dra. Domínguez no existe señalamiento o imputación de negligencia en cuanto al Dr. Ochoa. No hay crítica o imputación alguna ya sea en cuanto al proceso de intubación hecha por el Dr. Ochoa, la admisión y/o el tratamiento brindado en la Unidad Pediátrica de Cuidados Intensivos ("PICU" por sus siglas en inglés "Pediatric Intensive Care Unit"). Tampoco se**

**indica que el Dr. Ochoa haya perforado el pulmón de la menor o que haya incurrido en desviación alguna en cuanto a la forma en la cual se llenó el Certificado de Defunción de la menor.** [Exhibit 1, Informe pericial Dra. Domínguez, págs. 1-12.]

11. **En el informe de la Dra. Domínguez no hace imputación alguna de negligencia en cuanto a la intervención de la Dra. Casado con la paciente, y su informe no contiene opiniones sobre manejo o (sic) de esta paciente en PICU.** Refiérase a Anejo I. (sic) y al Anejo VI de la Solicitud de Sentencia Sumaria de la Dra. Casado (Transcripción de la deposición de la Dra. Domínguez pág. 61 L. 10-15, pág. 67 L. 14-19, pág. 72 L. 6-9 pág. 73 L. 17-24).

12. El 10 de octubre de 2022, se tomó la deposición de la Dra. Domínguez, perito de negligencia de la parte demandante. [Exhibit 2, transcripción de la deposición de la Dra. Domínguez.]

[…]

14. **El informe pericial de la Dra. Domínguez es final y contiene todas sus opiniones en el caso.** [Exhibit 2, transcripción de la deposición de la Sra. Domínguez, pág. 44, líneas 7-12.]

15. Cuando en su informe pericial la Dra. Domínguez se refiere al "equipo" de Sala de Emergencias, no se refiere ni al Dr. Ochoa ni a la Dra. Casado. [Exhibit 2, transcripción de la deposición de la Dra. Domínguez, pág. 54, líneas 2-6.]

16. **La menor Alana tuvo un arresto cardiorrespiratorio en el PRWCH el 24 de otubre de 2020.** [Exhibit 2, transcripción de la deposición de la Dra. Domínguez, pág. 52, líneas 24-25, pág. 53, líneas 1-3.]

17. **En su informe pericial, el único arresto que opina la Dra. Domínguez que pudo haber sido evitado fue ese primero.** [Exhibit 2, transcripción de la deposición de la Dra. Domínguez, pág. 119, líneas 16-19.]

18. La Dra. Domínguez no se considera experta en Intensivo Pediátrico. [Exhibit 2, transcripción de la deposición de la Dra. Domínguez, pág. 25, líneas 23-25.]

19. El informe pericial de la Dra. Domínguez no establece el estándar del manejo de la paciente una vez llegó a PICU. Los estándares para el manejo en PICU no están dentro de su "expertise". [Exhibit 2, transcripción de la deposición de la Dra. Domínguez, pág. 73, líneas 17-24; pág. 112, líneas 12-15.]

20. **La única doctora atendiendo a la paciente en Sala de Emergencias era la Dra. Ramírez.** [Exhibit 2, transcripción de la deposición de la Dra. Domínguez, pág. 53, líneas 9-14.]

[…]

22. **Cuando la paciente llega a PICU en el turno de la Dra. Casado el día 24 de octubre de 2020, llega post el arresto cardio respiratorio (sic) del cual la habían resucitado, post aspiración de líquido gástrico, entubada en ventilador mecánico, con parámetros de oxígeno para el ventilador, que había convulsado, había sido manejada y**

**con medicamentos anticonvulsivos y [ó]rdenes de manejo en PICU.** Refiérase al Anejo I, pág. 9 párrafo 3 y al Anejo IX (Transcripción de la deposición de la Dra. Domínguez pág. 64 L. 7-11, pág. 112 L. 3-11 y L-16-19).

23. **Ante el hecho de que la niña había convulsado había que realizarle un CT Scan de la cabeza, el cual fue ordenado por la Dra. Casado y realizado en la tarde del 24 de octubre de 2020, y que la Dra. Domínguez entiende que dicha orden fue correcta.** Refiérase al Anejo X (Transcripción de la deposición de la Dra. Domínguez pág. 66 L. 19-24, pág. 115 L. 10-21).

[...]

25. **Previo a que ocurriese el primer arresto del 24 de octubre de 2020, no hay anotaciones, evaluaciones ni órdenes del Dr. Ochoa ni de la Dra. Casado en el récord médico.** [Exhibit 2, transcripción de la deposición de la Dra. Domínguez, pág. 52, líneas 24-25, pág. 53, líneas 1-8.]

26. Antes de que la paciente Alana tuviese la emergencia del arresto, no hay consultas puestas de sala de emergencia a otros especialistas en el hospital. [Exhibit 2, transcripción de la deposición de la Dra. Domínguez, pág. 53, líneas 20-25, pág. 54, líneas 15-19.]

[...]

28. **Habiendo revisado el récord médico, la Dra. Domínguez no tiene duda que ni el Dr. Ochoa ni la Dra. Casado participaron en la atención de la paciente en Sala de Emergencias previo al arresto que ocurrió en la madrugada del 24 de octubre de 2020.** [Exhibit, transcripción de la deposición de la Dra. Domínguez, pág. 53, líneas 20-25, pág. 54, línea 1.]

29. El informe pericial de la Dra. Domínguez no contiene opiniones sobre el manejo de la paciente una vez admitida a PICU. [Exhibit 2, transcripción de la deposición de la Dra. Domínguez, pág. 61, líneas 10-15; pág. 67, líneas 14-19.]

30. **En el informe pericial de la Dra. Domínguez no existe[n] imputaciones de negligencia en cuanto al Dr. Ochoa.** Solo se menciona que él fue a atender la emergencia, ayudar con el CPR en Sala de Emergencias. [Exhibit 2, transcripción de la deposición de la Dra. Domínguez, pág. 55, líneas 7-17.]

31. La primera intervención del Dr. Ochoa fue para asistir con el "code" ("código") de arresto. Procede a entubar a la paciente y a hacer los procesos para admitirla a PICU. Se llama al Dr. Ochoa para asistir con esfuerzos de CPR ("resucitación cardiopulmonar" o "CPR" por sus siglas en inglés "cardiopulmonary resuscitation") [Exhibit 2, transcripción de la deposición de la Dra. Domínguez, pág. 55, líneas 7-17.]

32. En su informe pericial **no se menciona que**, en dicho momento, **cuando el Dr. Ochoa asiste con proceso de intubación, haya habido neumotórax o perforación del pulmón.** [Exhibit 2, transcripción de la deposición de la Dra. Domínguez, pág. 56, líneas 13-21.]

33. En la pág. 105 del récord médico certificado de PRWCH **hay placa hecha luego de la intubación interpretada y**

**leída a las 7:30 am. (sic) donde específicamente se dice no hay neumotórax y que el tubo está colocado. No hay mención de perforación del pulmón en esta placa.** [Exhibit 2, transcripción de la deposición de la Dra. Domínguez, pág. 56, líneas 22-25, pág. 57, líneas 4-7.]

34. Cuando en su informe pericial menciona el desarrollo de un neumotórax del récord médico, **no se está refiriendo al Dr. Ochoa.** [Exhibit 2, transcripción de la deposición de la Dra. Domínguez, pág. 57, líneas 4-7.]

35. La Dra. Domínguez no tiene opinión en cuanto a cómo el Dr. Ochoa entubó a la paciente en Sala de Emergencias una vez fue a asistir con el CPR. [Exhibit 2, transcripción de la deposición de la Dra. Domínguez, pág. 64, líneas 12-16.]

36. **El manejo de la resucitación tras el primer arresto fue apropiado. En Pediatría hay que prevenir el arresto.** [Exhibit 2, transcripción de la deposición de la Dra. Domínguez, pág. 111, líneas 1-24.]

37. **Nótese que la prevención del arresto al cual se refiere la Dra. Domínguez es el primer arresto que tuvo esa menor y que su informe está dirigido al equipo de Sala de Emergencias, del cual el Dr. Ochoa ni la Doctora Casado son es (sic) parte.**

38. La parte demandante rechazó el ofrecimiento del Dr. Ochoa, la Dra. Casado y Servicios Neonatales Gu[a]ili CSP y se negó a desistir voluntariamente del caso en cuanto a la compareciente. [Exhibit 5, carta de la representación legal de la parte demandante con fecha de 24 de otubre de 2022.]

(Énfasis nuestro).

A la luz de las anteriores determinaciones, el TPI resolvió que, de la supuesta prueba nueva alegada por los demandantes, no surgen hechos que puedan dirimirse sin la necesidad de prueba pericial. Sobre el particular, el foro primario señaló que, del testimonio de los doctores, no surgen detalles sobre la prueba nueva que coloquen al tribunal en posición de hacer una determinación sin prueba pericial. Por tanto, el TPI concluyó que la alegada prueba nueva es compleja, por lo que es necesario un perito para poder dilucidarla. A lo anterior, añadió que Rodríguez-Rodríguez afirmó que no anunciarían perito para dicha prueba. No obstante, el TPI destacó que la propia perito de los demandantes, la Dra. Domínguez, eximió a la Dra. Casado y al Dr. Ochoa, por lo que procedía la desestimación con perjuicio de la causa de acción de negligencia contra éstos, por no ser responsables de los hechos.

En cuanto la *Moción de Sentencia Sumaria Solicitando Aplicación de la Ley 136-2006, Centros Médicos Regionales,* presentada por el Dr. Ochoa*,* el TPI determinó que, conforme preceptúa el Artículo 3(b) de la Ley 136-2006, *supra,* la inmunidad conferida por dicho estatuto aplica también cuando se proveen servicios de salud. Por ello, concluyó que el Dr. Ochoa, al ser un facultativo médico que se dedica, entre otras cosas, a educar médicos en el Hospital donde ocurrieron los hechos, a éste le cobija la inmunidad de la Ley 136-2006, *supra.* Por lo anterior, el TPI también desestimó la causa de acción contra el Dr. Ochoa de conformidad con la inmunidad establecida en la Ley 136-2006, *supra* y la Ley 104-1955, *supra.*

Consecuentemente, el TPI también desestimó la causa de acción contra SNG, pues al no habérsele impuesto responsabilidad a los doctores Ochoa y Casado, no procedía imponerle responsabilidad a dicha entidad. Así, el TPI desestimó el pleito en su totalidad, con perjuicio.

Insatisfecho, Rodríguez-Rodríguez presentó una *Solicitud de Reconsideración*[27] el 27 de febrero de 2025. Los apelados presentaron *Oposición a Reconsideración*[28]. El 2 de abril de 2025, el TPI denegó la solicitud de reconsideración.[29]

Inconformes, Rodríguez-Rodríguez, acude ante nos mediante recurso de apelación y formula los siguientes señalamientos de error:

ERROR NÚMERO I

ERRÓ EL TPI AL NO RECONOCER HECHOS MATERIALES EN CONTROVERSIA LOS CUALES IMPEDÍAN LA DISPOSICIÓN SUMARIA DEL CASO.

---

[27] Apéndice 2 del recurso, págs. 21-53.
[28] Apéndice 4 y Apéndice 5 del recurso, págs. 67-84 y 85-100, respectivamente.
[29] Apéndice 6 del recurso, pág. 101.

ERROR NÚMERO 2

ERRÓ EL TPI AL CONCLUIR QUE NECESITA PRUEBA PERICIAL PARA DETERMINAR SI LA DOCTORA CASADO INCURRIÓ EN MALA PRÁCTICA Y NO TOMAR EN CONSIDERACIÓN EL PROPIO TESTIMONIO BAJO JURAMENTO DE ESTA DURANTE SU DEPOSICIÓN.

ERROR NÚMERO 3

ERRÓ EL TPI AL CONCLUIR QUE AL DOCTOR OCHOA LE APLICA INMUNIDAD BAJO LA LEY 136-2006, EN LUGAR DE LA APLICACIÓN AL PRIMERO DE LOS LÍMITES DE RESPONSABILIDAD AL AMPARO DE LA LEY DE PLEITOS CONTRA EL ESTADO, LEY 104.

ERROR NÚMERO 4

ERRÓ EL TPI AL DESESTIMAR LAS CAUSAS DE ACCIÓN CONTRA GUAILI POR SU RESPONSABILIDAD VICARIA, DEBIDO A QUE EXISTIAN HECHOS ESPECIFICOS EN CONTROVERSIA CON RELACIÓN A LA NEGLIGENCIA Y RESPONSABILIDAD DE LOS DOCTORES CASADO Y OCHOA.

El 30 de mayo de 2025, el Dr. Ochoa y su aseguradora PRMDIC presentaron *Alegato de la Parte Apelada Dr. Ochoa y PRMDIC como su aseguradora.* El 2 de junio de 2025, SNG presentó *Alegato en Oposición a Recurso de Apelación.* El 6 de junio de 2025, la Dra. Casado y su aseguradora PRMDIC presentaron *Alegato de la Parte Apelada Dra. María P. Casado García y PRMDEIC como su aseguradora.*

Con el beneficio de la comparecencia de las partes, estamos en posición de resolver.

II.

A.

El mecanismo de sentencia sumaria provisto en la Regla 36 de Procedimiento Civil de 2009, 32 LPRA Ap. V, R. 36, es un vehículo para asegurar la solución justa, rápida y económica de un caso. *Serrano Picón v. Multinational Life Ins.,* 212 DPR 981 (2023); *Oriental Bank v. Caballero García,* 212 DPR 671 (2023); *González Meléndez v. Mun. San Juan et al.,* 212 DPR 601 (2023); *Acevedo y otros v. Depto. Hacienda y otros,* 212 DPR 335 (2023); *Universal Ins. y otro*

*v. ELA y otros*, 211 DPR 455 (2023). Dicho mecanismo permite a los tribunales disponer, parcial o totalmente, de litigios civiles en aquellas situaciones en las cuales no exista controversia material de hecho que requiera ventilarse en un juicio plenario y el derecho así lo permita. *Segarra Rivera v. Int'l. Shipping et al.*, 208 DPR 964 (2022). Este mecanismo lo puede utilizar la parte reclamante o aquella parte que se defiende de una reclamación. 32 LPRA Ap. V, R. 36.1 y 36.2.

Mediante el mecanismo de sentencia sumaria, se procura profundizar en las alegaciones para verificar si, en efecto, los hechos ameritan dilucidarse en un juicio. *León Torres v. Rivera Lebrón,* 204 DPR 20, 42 (2020). Este cauce sumario resulta beneficioso tanto para el tribunal, como para las partes en un pleito, pues se agiliza el proceso judicial, mientras simultáneamente se provee a los litigantes un mecanismo procesal encaminado a alcanzar un remedio justo, rápido y económico. *Segarra Rivera v. Int'l. Shipping et al.*, supra. Como se sabe, en aras de prevalecer en una reclamación, la parte promovente debe presentar prueba incontrovertible sobre todos los elementos indispensables de su causa de acción. *Íd.*

Nuestro ordenamiento civil y su jurisprudencia interpretativa impone unos requisitos de forma con los cuales hay que cumplir al momento de presentar una solicitud de sentencia sumaria, a saber: (1) una exposición breve de las alegaciones de las partes; (2) los asuntos litigiosos o en controversia; (3) la causa de acción sobre la cual se solicita la sentencia sumaria; (4) una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en

evidencia que se encuentre en el expediente del tribunal; (5) las razones por las cuales se debe dictar la sentencia, argumentando el derecho aplicable, y (6) el remedio que debe ser concedido. 32 LPRA Ap. V, R. 36.3; *Oriental Bank v. Caballero García,* supra; *Pérez Vargas v. Office Depot,* 203 DPR 687 (2019). Si la parte promovente de la moción incumple con estos requisitos, "el tribunal no estará obligado a considerar su pedido". *Meléndez González et al. v. M. Cuebas,* 193 DPR 100, 111 (2015).

Por otro lado, "la parte que desafía una solicitud de sentencia sumaria no puede descansar en las aseveraciones o negaciones consignadas en su alegación". *León Torres v. Rivera Lebrón,* supra*, pág. 43. Por el contrario, quien se opone a que se declare con lugar esta solicitud viene obligado a enfrentar la moción de su adversario de forma tan detallada y específica como lo ha hecho la parte promovente puesto que, si incumple, corre el riesgo de que se dicte sentencia sumaria en su contra, si la misma procede en derecho. *Íd.*

Por ello, en la oposición a una solicitud de sentencia sumaria, la parte promovida debe puntualizar aquellos hechos propuestos que pretende controvertir y, si así lo desea, someter hechos materiales adicionales que alega no están en disputa y que impiden que se dicte sentencia sumaria en su contra. *León Torres v. Rivera Lebrón,* supra. Claro está, para cada uno de estos supuestos deberá hacer referencia a la prueba específica que sostiene su posición, según exigido por la Regla 36.3 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3. *Íd.* En otras palabras, la parte opositora tiene el peso de presentar evidencia sustancial que apoye los hechos materiales que alega están en disputa. *Íd.* De lo anterior, se puede colegir que, ante el incumplimiento de las partes con las formalidades de la Regla 36 de Procedimiento Civil de 2009, *supra,* la consideración de sus posiciones descansa en la sana discreción del Tribunal.

Al atender la solicitud, el Tribunal deberá asumir como ciertos los hechos no controvertidos que se encuentren sustentados por los documentos presentados por la parte promovente. *E.L.A. v. Cole*, 164 DPR 608, 626 (2005). Toda inferencia razonable que pueda surgir de los hechos y de los documentos se debe interpretar en contra de quien solicita la sentencia sumaria, pues solo procede si bajo ningún supuesto de hechos prevalece la parte promovida. *Íd.*, pág. 625. Además, al evaluar los méritos de una solicitud de sentencia sumaria, el juzgador o juzgadora debe actuar guiado por la prudencia y ser consciente, en todo momento, que su determinación puede conllevar el que se prive a una de las partes de su "día en corte", componente integral del debido proceso de ley. *León Torres v. Rivera Lebrón,* supra, pág. 44.

Sin embargo, la sentencia sumaria generalmente no procederá cuando existan controversias sobre hechos esenciales materiales, o si la controversia del caso está basada en elementos subjetivos como intención, propósitos mentales, negligencia o credibilidad. *Cruz, López v. Casa Bella y otros*, 213 DPR 980 (2024); *Acevedo y otros v. Depto. Hacienda y otros*, supra; *Segarra Rivera v. Int'l. Shipping et al.,* supra. Un hecho material es aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable. *Banco Popular de Puerto Rico v. Zorrilla Posada y otro,* 2024 TSPR 62, resuelto el 17 de junio de 2024; *Oriental Bank v. Caballero García,* supra, pág. 7; *Mejías et al. v. Carrasquillo et al.*, 185 DPR 288, 299 (2012); *Ramos Pérez v. Univisión*, 178 DPR 200, 213 (2010). Ahora bien, el Foro de última instancia ha reiterado que cualquier duda no es suficiente para derrotar una moción de sentencia sumaria, pues debe tratarse de una incertidumbre que permita concluir que existe una controversia real sobre hechos relevantes y pertinentes. *Íd.* Además, existen casos que no se deben resolver mediante sentencia sumaria porque resulta difícil reunir la

verdad de los hechos mediante declaraciones juradas o deposiciones. *Jusino et als. v. Walgreens*, 155 DPR 560, 579 (2001). De igual modo, no es apropiado resolver por la vía sumaria "casos complejos o casos que involucren cuestiones de interés público". *Íd.* No obstante, la sentencia sumaria procederá si atiende cuestiones de derecho. *Universal Ins. y otro v. ELA y otros*, supra.

El Tribunal Supremo de Puerto Rico ha discutido los criterios que este Tribunal de Apelaciones debe considerar al momento de revisar una sentencia dictada sumariamente por el foro de instancia. *Roldán Flores v. M. Cuebas et al.*, 199 DPR 664, 679-680 (2018); *Meléndez González et al. v. M. Cuebas*, supra, págs. 118-119. Sobre ese particular, nuestro más Alto Foro señaló que:

> [E]l Tribunal de Apelaciones debe: (1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra*, y la jurisprudencia le exigen al foro primario; (2) revisar que tanto la Moción de Sentencia Sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36; (3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos, y (4) de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia. *Roldán Flores v. M. Cuebas et al.,* supra, pág. 679.

Conforme a lo anterior, nos encontramos en la misma posición que el Tribunal de Primera Instancia para evaluar la procedencia de una sentencia sumaria. *Banco Popular de Puerto Rico v. Cable Media of Puerto Rico, Inc. y otro*, 2025 TSPR 1, resuelto el 7 de enero de 2025; *Banco Popular de Puerto Rico v. Zorrilla Posada y otro*, supra; *Birriel Colón v. Econo y otro*, 213 DPR 80 (2023); *Serrano Picón v. Multinational Life Ins.*, supra; *González Meléndez v. Mun. San Juan et al.,* supra; *González Santiago v. Baxter Healthcare*, 202 DPR 281, 291 (2019). Por ello, nuestra revisión es una *de novo* y nuestro análisis debe regirse por las disposiciones de la Regla 36 de

Procedimiento Civil, *supra,* así como de su jurisprudencia interpretativa. *González Meléndez v. Mun. San Juan et al.*, supra. A tenor con la referida normativa, dicha revisión se realizará de la manera más favorable hacia la parte que se opuso a la solicitud de sentencia sumaria en el foro de origen y realizando todas las inferencias permisibles a su favor. *Birriel Colón v. Econo y otro*, supra; *Meléndez González et al. v. M. Cuebas*, supra, pág. 118. De esta manera, si entendemos que los hechos materiales realmente están incontrovertidos, debemos revisar *de novo* si el foro primario aplicó correctamente el derecho. *González Meléndez v. Mun. San Juan et al.*, supra.

B.

Los actos y omisiones en que intervenga cualquier género de culpa o negligencia son fuentes de obligaciones que generan responsabilidad civil extracontractual. 31 LPRA sec. 2992.[30] Por ello, el Artículo 1802 del Código Civil de Puerto Rico de 1930 establece que, "[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado [...]". 31 LPRA sec. 5141. La responsabilidad civil al amparo de esta norma requiere la concurrencia de tres elementos, a saber: (1) la ocurrencia de un daño; (2) que dicho daño hubiera surgido como resultado de un acto u omisión culposa o negligente del demandado y (3) la existencia de un nexo causal entre el daño sufrido y dicho acto u omisión. *Sucn. Mena Pamias et al. v. Meléndez et al.*, 212 DPR 758, 768 (2023); *Nieves Díaz v. González Massas*, 178 DPR 820, 843 (2010); *López v. Porrata Doria*, 169 DPR 135, 150 (2006). Las acciones por responsabilidad civil extracontractual "se distinguen porque la responsabilidad frente al perjudicado surge sin

---

[30] El derecho aplicable en el caso de autos se remite al Código Civil de Puerto Rico de 1930, 31 LPRA sec. 1 *et seq.* (derogado), toda vez que nos encontramos ante hechos ocurridos con anterioridad a la aprobación y vigencia del Código Civil de Puerto Rico de 2020, Ley Núm. 55-2020, 31 LPRA sec. 5311 *et seq.*

que le preceda una relación jurídica entre las partes". *Maderas Tratadas v. Sun Alliance*, 185 DPR 880, 908 (2012). En estos casos, la culpa o negligencia consiste en la falta de cuidado al no anticipar o prever las consecuencias de un acto, tal y como lo haría una persona prudente y razonable en iguales circunstancias. *Montalvo v. Cruz*, 144 DPR 748, 755–756 (1998). Siendo ello así, la norma exige que se actúe con el grado de cuidado, diligencia, vigilancia y precaución que las particularidades del asunto de que trate exijan. *Monllor v. Soc. de Gananciales*, 138 DPR 600, 604 (1995).

En *Rodríguez et al. v. Hospital et. al.*, 186 DPR 889, 900 (2016), se reiteró y recalcó que una acción para exigir responsabilidad profesional a un médico no es distinta a la de un caso ordinario de daños y perjuicios por negligencia al amparo del Artículo 1802 del Código Civil, *supra.* Por lo tanto, al igual que cualquier otra causa de acción por daños y perjuicios, la reclamación por impericia médica requiere que la parte demandante establezca por preponderancia de la evidencia, creída por el juzgador, que los actos de negligencia, falta de cuidado o impericia del médico causaron el daño reclamado. *Íd.*

En los casos de impericia médica es necesario que el promovente de la acción demuestre la ocurrencia de un acto médico culposo o negligente, la producción de un daño real y la relación causal entre el acto del médico y el daño sufrido. *Soto Cabral v. ELA*, 138 DPR 298, 308-309 (1995). De modo que le corresponde al demandante probar, mediante preponderancia de la prueba, que las acciones negligentes del médico fueron el factor que con mayor probabilidad ocasionó el daño sufrido y establecer el vínculo causal requerido por el Artículo 1802 del Código Civil de Puerto Rico de 1930, *supra. Castro Ortiz v. Mun. de Carolina*, 134 DPR 783, 793 (1993); *Pagán Rivera v. Mun. de Vega Alta*, 127 DPR 538 (1990);

*Torres Ortiz v. Plá,* 123 DPR 637 (1989); *Rodríguez Crespo v. Hernández,* 121 DPR 639, 650 (1988).

Sin embargo, en nuestra jurisdicción rige una presunción a favor del médico que sugiere que este haya observado un grado razonable de cuidado y atención en la administración del tratamiento médico y que los exámenes practicados al paciente hayan sido adecuados. Por ello, le corresponde a la parte demandante controvertir esta presunción con prueba que demuestre algo más que una mera posibilidad de que el daño se debió al incumplimiento del médico de su obligación profesional. La relación de causalidad no se puede establecer a base de una mera especulación o conjetura. *López v. Dr. Cañizares,* 163 DPR 119, 134-135 (2004); *Blás v. Hosp. Guadalupe,* 146 DPR 267, 324 (1998). *Santiago Otero v. Méndez,* 135 DPR 540, 549 (1994).

Al evaluar esta prueba, el tribunal debe considerar que en nuestro ordenamiento jurídico las normas mínimas de cuidado, conocimiento y destrezas que le son requeridas a los profesionales de la salud, en casos de alegada mala práctica profesional, son las de brindar a sus pacientes aquella atención que, "a la luz de los modernos medios de comunicación y enseñanza, y conforme al estado de conocimiento de la ciencia y la práctica prevaleciente de la medicina, satisface las exigencias profesionales generalmente reconocidas por la profesión médica". *López v. Dr. Cañizares,* supra, pág. 133; *Santiago Otero v. Méndez,* supra.

Hay que tener presente que la negligencia del médico no se presume por el hecho de que el paciente haya sufrido un daño o que el tratamiento no haya sido exitoso. *López v. Dr. Cañizares,* supra; *Rodríguez Crespo v. Hernández,* supra, pág. 650. Se ha dicho al respecto que, para establecer un caso prima facie de impericia médica, se tiene que presentar prueba sobre: (1) las normas mínimas de conocimiento y cuidado médico aplicables a los

generalistas o a los especialistas; (2) demostrar que la parte demandada incumplió con estas normas en el tratamiento del paciente; y (3) demostrar que esta fue la causa de la lesión sufrida por el paciente. *Arrieta v. Dr. de la Vega*, 165 DPR 538, 548-549 (2005); *Medina Santiago v. Vélez*, 120 DPR 380, 385 (1988); *Rodríguez Crespo v. Hernández*, supra, pág. 650.

Lo anterior quiere decir que le corresponde a la parte demandante establecer, mediante prueba pericial, cuáles son los requisitos de cuidado y conocimiento científico requeridos por la profesión en un tratamiento determinado, las normas de conocimiento informado y la razón por la cual el médico demandado no cumplió con las mismas. *Rodríguez Crespo v. Hernández*, supra, págs. 650-651; *Medina Santiago v. Vélez*, supra, pág. 385. Conforme a la norma antes indicada, el médico solamente responde por los daños y perjuicios causados cuando actúa negligentemente, con descuido o cuando falta a la pericia profesional que exigen las circunstancias. *Ríos Ruiz v. Mark*, 119 DPR 816, 820 (1987); *López v. Dr. Cañizares*, supra, pág. 134.

Durante las últimas décadas, se han establecido distintas bases para imponerle responsabilidad a los hospitales por los daños que puedan sufrir los pacientes. *Fonseca v. HIMA*, 184 DPR 281 (2012); *Sagardía de Jesús v. Hosp. Aux. Mutuo*, 177 DPR 484 (2009); *Blás v. Hosp. Guadalupe*, 146 DPR 267 (1998); *Márquez Vega v. Martínez Rosado*, 116 DPR 397, 404–405 (1985); *Núñez v. Cintrón*, 115 DPR 598 (1984); *Hernández v. La Capital*, 81 DPR 1031, 1038 (1960). Lo anterior se sustenta al amparo de la doctrina de responsabilidad vicaria, recogida en el Artículo 1803 del Código civil, 31 LPRA ant. sec. 5142. Así pues, los hospitales generalmente responden por los actos de los médicos que ofrecen sus servicios en sus facilidades, particularmente cuando el paciente acude al hospital sin tener una relación previa con el médico. Los hospitales

siempre responden vicariamente por los médicos que son sus empleados. También responden, de ordinario, por los actos negligentes de los médicos que, aunque no son sus empleados, son parte de su facultad (staff) y están disponibles para consultas de otros médicos. *Márquez Vega v. Martínez Rosado*, supra, pág. 407; *Núñez v. Cintrón*, supra, pág. 606. Incluso, los hospitales ordinariamente responden también por los concesionarios de franquicias exclusivas para prestar servicios en el hospital cuando cometen actos de impericia médica. *Sagardía de Jesús v. Hosp. Aux. Mutuo*, supra, págs. 515-516. Son ejemplos de estos concesionarios los anestesiólogos, radiólogos y proveedores de servicios de sala de emergencia. Íd. Respecto a estos, el hospital es responsable por haber seleccionado a ese personal y tenerlo ofreciendo servicios a los pacientes. *Íd.*

Según adelantado, en lo referente a los médicos que no son empleados del hospital, pero gozan del privilegio de usar las instalaciones del hospital para recluir a sus pacientes privados, el hospital responderá por los actos de dichos médicos en las siguientes circunstancias. El hospital responde si le asignó el paciente al médico, lo cual típicamente ocurre cuando el paciente acudió directamente al hospital en búsqueda de ayuda médica y este le proveyó al paciente los facultativos médicos que lo atendieron. *Sagardía de Jesús v. Hosp. Aux. Mutuo*, supra; *Márquez Vega v. Martínez Rosado*, supra. En ese caso, el hospital responde vicaria y solidariamente con el médico responsable del acto de impericia, sin importar si este último es (o no) un empleado del hospital, o uno a quien el hospital le haya concedido una franquicia para brindar servicios médicos especializados a los pacientes de este, o uno que es miembro de la facultad (staff) del hospital y a quien este llama en consulta para atender al paciente. *Íd.* Por otra parte, el hospital ordinariamente no responderá vicariamente por los actos del médico

si este no es su empleado y si se trata de un paciente privado de dicho médico que acude al hospital en virtud de la relación previa entre el paciente y dicho médico. *Sagardía de Jesús v. Hosp. Aux. Mutuo*, supra, pág. 513; *Márquez Vega v. Martínez Rosado*, supra, págs. 402–405. La anterior distinción responde a que, cuando el paciente acude al hospital, es dicha institución la que selecciona qué médico le atenderá, no teniendo el paciente ninguna participación al respecto. Por tanto, en esas circunstancias, el hospital debe responder vicariamente por los actos del médico. Es decir, cuando el paciente visita el hospital en búsqueda de asistencia, existe una garantía implícita de que los médicos seleccionados son competentes y capacitados para asistir adecuadamente al paciente. Más aún, desde el punto de vista del paciente, quien lo atiende es el hospital, y no médicos distintos e independientes los unos de los otros y, en esta situación, es con el hospital con quien el paciente tiene una relación contractual. En otras palabras, para fines del paciente, el hospital se proyecta como una comunidad que ofrece servicios de salud en conjunto. *Márquez Vega v. Martínez Rosado*, supra, págs. 407-408.

### C.

La inmunidad soberana es una doctrina de entronque constitucional que impide que se inste un procedimiento judicial contra el Estado en las cortes estatales, a menos que éste consienta a ello. Postula que el Estado no responderá por los daños ocasionados por sus oficiales, agentes o empleados en el desempeño de sus funciones. Esta doctrina rigió en Puerto Rico hasta que se aprobó la Ley Núm. 104 de 29 de junio de 1955, según enmendada, mejor conocida como la "Ley de Pleitos Contra el Estado", 32 LPRA secs. 3077 y ss., la cual constituye una renuncia amplia pero condicionada por parte del Estado a la protección que le brinda la inmunidad soberana. *Defendini Collazo et al. v. ELA, Cotto,* 134 DPR

28, 40, 48 (1993). Mediante la referida ley el Estado consintió a ser demandado en daños y perjuicios causados por acción u omisión de cualquier funcionario, agente o empleado del Estado, o cualquier otra persona actuando en su capacidad oficial y dentro del marco de su función, cargo o empleo interviniendo culpa o negligencia. Art. 2 la Ley Núm. 104, supra, 32 LPRA sec. 3077 (a).

La Ley de Pleitos contra el Estado autoriza este tipo de demandas en determinadas circunstancias. Al interpretar dicha ley, el Tribunal Supremo dispuso en *Leyva et al. v. Aristud et al.*, 132 DPR 489, 510 (1993), que para que un demandante pueda prevalecer debe establecer los siguientes elementos: (1) que la persona que le causó daño era agente, funcionario o empleado del Estado y que estaba actuando en su capacidad oficial al momento de causar el daño; (2) que el funcionario, agente o empleado actuó dentro del marco de su función; (3) que la actuación del empleado del Estado fue negligente y no intencional; y (4) que existe una relación causal entre la conducta culposa y el daño producido. Aún en casos de actuaciones intencionales de empleados públicos, el Estado podría estar sujeto a responsabilidad civil si "no tomó las medidas necesarias para supervisar de manera estricta aquellas actividades o personas que se podría prever causarían daño". *Íd.*, pág. 511. El criterio que debe considerarse es si "la actuación de los subalternos fuera prevista o previsible, aun cuando fuera intencional". *Íd.*, 512.

Una vez satisfechos los requisitos anteriores, el Estado está sujeto a la responsabilidad civil en cualquiera de los siguientes supuestos: (1) cuando el empleado, agente o funcionario causa un daño por su exclusiva culpa o negligencia mientras desempeña sus funciones y actúa en su capacidad oficial; (2) cuando el empleado, agente o funcionario causa un daño mientras desempeña sus funciones y actúa en capacidad oficial por una actuación

preponderantemente negligente, aun cuando dicha conducta tenga algunos elementos intencionales; (3) cuando a pesar de que el daño fue directamente producido por un acto enteramente intencional de los cuales no responde el Estado, hubo otros actos negligentes separados co-causantes del daño por los cuales sí debe responder; y (4) cuando el Estado a través de sus agentes es negligente por omisión al incumplir con un deber impuesto por las leyes y la Constitución. *Íd.*, págs. 510–511; *Vda. De Valentín v. ELA*, 84 DPR 112, 119 (1961).

La propia Ley 104, *supra*, en su Artículo 6, no autoriza que se presenten demandas contra el Estado cuando las demandas están basadas en actos de sus "empleados, agentes o funcionarios constitutivos de acometimiento, agresión, arresto ilegal, persecución maliciosa o encarcelamiento ilegal". Lo que significa que, si se prueba que el funcionario actuó en su carácter personal, responde él por sus propias actuaciones. *Íd.*, pág. 497; *Galarza Soto v. ELA*, 109 DPR 179, 200 (1979).

De acuerdo con el Tribunal Supremo, el legislador "lo que quiso hacer fue conservar la inmunidad del Estado contra litigios originados por aquellos actos torticeros cometidos deliberada o intencionalmente por sus funcionarios, agentes o empleados". *Alberio Quiñónez v. ELA*, 90 DPR 812 (1964). Así, se ha establecido que "[l]a inmunidad del Estado contra reclamaciones por daños se ha reducido a aquellas originadas en actos criminosos cometidos intencional o deliberadamente por sus funcionarios, agentes o empleados". *Rivera de Vincenti v. ELA*, 108 DPR 64 (1978).

Si bien es cierto que de ordinario las actuaciones de funcionarios públicos gozan de la inmunidad condicionada que los protege contra reclamaciones de daños en su carácter personal por el hecho de haber ejercido, de forma razonable y de buena fe, las funciones oficiales que contienen un elemento de discreción,

también es norma establecida que dicha inmunidad es una defensa afirmativa y el peso de la prueba recae sobre el funcionario demandado que reclame esta protección. *Acevedo v. Srio. Servicios Sociales*, 112 DPR 256, 263 (1982).

En cuanto a las condiciones que ha impuesto el Gobierno de Puerto Rico para poder ser demandado en daños y perjuicios, el Artículo 2(a) de la Ley de Pleito Contra el Estado dispone, en lo pertinente:

> Se autoriza demandar al Estado Libre Asociado de Puerto Rico ante el Tribunal de Primera Instancia de Puerto Rico por las siguientes causas: (a) Acciones por daños y perjuicios a la persona o a la propiedad hasta la suma de setenta y cinco mil (75,000) dólares causados por acción u omisión de cualquier funcionario, agente o empleado del Estado, o cualquier otra persona actuando en capacidad oficial y dentro del marco de su función, cargo o empleo interviniendo culpa o negligencia; o acciones por daños y perjuicios por alegados actos de impericia médico-hospitalaria a los profesionales de la salud que laboren en las áreas de obstetricia, ortopedia, cirugía general o trauma exclusivamente en instituciones de salud pública propiedad del Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades y/o municipios, independientemente de si dichas instituciones están administradas u operadas por una entidad privada. Cuando por tal acción u omisión se causaren daños y perjuicios a más de una persona, o cuando sean varias las causas de acción a que tenga derecho un solo perjudicado, la indemnización por todos los daños y perjuicios que causare dicha acción u omisión no podrá exceder de la suma de ciento cincuenta mil (150,000) dólares. Si de las conclusiones del tribunal surgiera que la suma de los daños causados a cada una de las personas excede de ciento cincuenta mil (150,000) dólares, el tribunal procederá a distribuir dicha suma entre los demandantes, a prorrata, tomando como base los daños sufridos por cada uno. [...].

Al evaluar una reclamación de esta índole, los tribunales deben acudir a las normas generales que ha establecido nuestro Tribunal Supremo sobre la culpa y negligencia en materia de responsabilidad extracontractual bajo los Arts. 1802 y 1803 del Código Civil, 31 LPRA secs. 5141 y 5142. Por tanto, se puede demandar al Estado y a un funcionario cuando este último actúa negligentemente u omite actuar de conformidad con sus funciones.

Sin embargo, no puede haber acumulación de indemnizaciones. *García v. ELA*, 146 DPR 725, 735 (1998); *González Pérez v. ELA*, 138 DPR 399, 408 (1995); *De Paz Lisk v. Aponte Roque*, 124 DPR 472, 493 (1989).

D.

Ahora bien, según veremos a continuación, por razones de política pública, la Asamblea Legislativa de Puerto Rico extendió los límites de responsabilidad civil extracontractual que le aplican al Estado a ciertas instituciones hospitalarias privadas que crean consorcios con las universidades de medicina acreditadas del país para el adiestramiento de médicos. <u>Entiéndase por límite de responsabilidad a la limitación impuesta por la legislatura a las cuantías compensables por actos u omisiones culposos o negligentes.</u> *Rodríguez Figueroa v. Centro de Salud Mario Canales Torresola et al.*, 197 DPR 876, 884 (2017).

No debe confundirse el límite de responsabilidad con la inmunidad, pues se trata de figuras mutuamente excluyentes. *Íd.,* pág. 898. La inmunidad es conferida por la Asamblea Legislativa en atención a consideraciones de política pública que rebasan los límites de los actos u omisiones del individuo que las disfruta; se trata de una inexistencia de causa de acción para quien la ostenta independientemente de que haya realizado un acto u omisión, culposo o negligente. *Íd.,* pág. 884. <u>Por consiguiente, a diferencia de la figura de la inmunidad, el límite de responsabilidad se activa a favor de quien lo disfruta ante actos u omisiones culposos o negligentes.</u>

La Ley Núm. 136-2006, *supra,* creó los Centros Médicos Académicos Regionales de Puerto Rico (en adelante CMAR o centros) para, entre otros objetivos, garantizar los talleres para la educación de profesiones de la salud, particularmente a los estudiantes de

medicina que se adiestran en la Isla. *Exposición de Motivos* de la *Ley de Centros Médicos Regionales de Puerto Rico,* Ley Núm. 136-2006, 24 LPRA sec. 10031 *et seq.* Los CMAR son en esencia corporaciones públicas o privadas que respaldan las Escuelas de Medicina acreditadas del país que ofrezcan programas acreditados de internados y residencias para profesionales de la salud, así como centros de investigación científica. *Íd.* Funcionan como entidades independientes sin fines de lucro, con personalidad jurídica, y separada de cualquier otra agencia o instrumentalidad del gobierno. 24 LPRA sec. 10032. Los CMAR cubren las siguientes regiones: Región Metro y Noreste, Región Central, Región Noroeste y Región Sur-Oeste, al que pertenece la Escuela de Medicina de Ponce. *Exposición de Motivos,* Ley Núm. 136-2006.

En lo aquí pertinente, el Artículo 7 de la Ley Núm. 136-2006, *supra,* dispone lo siguiente:

> Se extenderán las limitaciones impuestas en la Ley Núm. 104 de 29 de junio de 1995, según enmendada [Ley de Pleitos Contra el Estado], a los Centros Médicos Académicos Regionales, estudiantes, médicos en adiestramiento postgraduado y miembros de la facultad de los mismos, por los procedimientos médicos que se lleven a cabo en dichos Centros en el ejercicio de sus funciones. Dicha limitación establece un máximo de $75,000.00 por los daños sufridos por una persona y hasta $150,000.00 cuando los daños y perjuicios se le causaron a más de una persona, o cuando sean varias las causas de acción a que tenga derecho un solo perjudicado. ... 24 LPRA sec. 1035

Según surge de lo anterior, mediante la Ley Núm. 136-2006, *supra,* la Asamblea Legislativa extendió los límites de responsabilidad que disfruta el gobierno de Puerto Rico al amparo de la Ley de Pleitos contra el Estado a los CMAR**,** los estudiantes, médicos en adiestramiento postgraduado y miembros de la facultad de éstos, "por los procedimientos médicos que se lleven a cabo en dichos Centros en el ejercicio de sus funciones". 24 LPRA sec. 10035. (Énfasis nuestro).

De conformidad con lo anterior, el Artículo 41.050 del Código de Seguros de Puerto Rico[31], dispone, en lo aquí pertinente, lo siguiente:

> [...]
> Se aplicarán los límites de responsabilidad que Ley Núm. 104 de 29 de junio de 1955, según enmendada, impone al Estado Libre Asociado de Puerto Rico, en similares circunstancias, en los siguientes escenarios:
> [...]
> vii. A los Centros Médicos Académicos Regionales de Puerto Rico, sus estudiantes y miembros de facultad cuando recaiga sentencia por actos constitutivos de impericia médica hospitalaria ("malpractice") cometida por sus estudiantes y miembros de su facultad en el desempeño de sus funciones docentes. [...]. 26 LPRA sec. 4105.

En *Rodríguez Figueroa v. Centro de Salud Mario Canales Torresola et al.*, 197 DPR 876 (2017), el Tribunal Supremo interpretó los estatutos antes citados para aclarar el alcance del límite de responsabilidad extendido a los CMAR, sus residentes y facultativos. Intimó que la intención legislativa tanto en la redacción del Art. 7 de la Ley Núm. 136-2006, *supra,* así como en el lenguaje del Art. 41.050 del Código de Seguros, *supra,* fue establecer la aplicación de los límites de responsabilidad aplicables al Estado, no de arrogar inmunidad a los centros, los estudiantes y su facultad. De conformidad con dicho análisis el alto foro concluyó que tanto los CMAR, los estudiantes y los miembros de la facultad, en casos de impericia médico-hospitalaria, no les cobija una inmunidad, sino un límite monetario a las cuantías que se le podría imponer en su día. Por lo que, tales entidades e individuos pueden ser incluidos en una demanda sobre impericia médico-hospitalaria.

En síntesis, el límite de responsabilidad concedido a los CMAR, sus estudiantes y facultad, solo se activa ante acciones u omisiones negligentes o culposas cometidas por los estudiantes y miembros de la facultad como parte de sus funciones académicas.

---

[31] 26 LPRA sec. 4105.

Por tanto, antes de aplicar al CMAR los límites monetarios, es necesario establecer (1) que los estudiantes o facultativos incurrieron en negligencia o culpa, y (2) que al hacerlo, actuaban en el desempeño de sus labores docentes.

III.

En su primer señalamiento de error, Rodríguez-Rodríguez alega que el foro primario incidió al no reconocer hechos materiales en controversia que impedían la disposición del caso por la vía sumaria. A tenor con el marco jurídico previamente expuesto, nos encontramos en la misma posición que el TPI en revisar una solicitud de sentencia sumaria. En primer lugar, nos compete evaluar si las partes cumplieron con los requisitos de forma exigidos por la Regla 36.3 de Procedimiento Civil, *supra*, respecto a la moción de sentencia sumaria, así como su oposición.

De una revisión *de novo* de la solicitud de sentencia sumaria y la oposición, determinamos que los escritos presentados por las partes cumplen con los requisitos de la Regla 36.

De una minuciosa revisión al expediente, concluimos que no existen hechos en controversia y que las determinaciones de hechos del TPI encuentran apoyo en la prueba que surge del expediente. Conforme razonado por el TPI, no surgen imputaciones de negligencia en contra de la Dra. Casado y el Dr. Ochoa. Lo anterior, fue reconocido por la Dra. Domínguez, perito de Rodríguez-Rodríguez. La propia prueba pericial de los apelantes estableció que solo el primer arresto cardiorrespiratorio, el cual ocurrió en Sala de Emergencia, es el que pudo haberse evitado[32]. En dicho incidente, ni la Dra. Casado ni el Dr. Ochoa habían intervenido con la menor[33]. No se cometió el primer señalamiento de error.

---

[32] Véase determinaciones de hecho número 16, 17 y 20.
[33] Determinación de hecho número 25 y 28.

En cuanto al segundo y cuarto señalamiento de error, concluimos que el foro primario no incidió al determinar que la nueva prueba alegada por los apelantes requería ser probada a través de prueba pericial. De un estudio minucioso del expediente, se desprende con claridad que estamos ante un caso complejo y delicado en el que se imputa negligencia por impericia médica por los alegados actos y omisiones durante el diagnóstico y tratamiento de la menor, quien llegó a la Sala de Emergencias con un cuadro de salud ya comprometido. Conforme expusimos anteriormente, nuestra jurisdicción reconoce una presunción de corrección a favor del médico, por lo que le correspondía a la parte apelante controvertir dicha presunción de forma que demostrara que existía más que una mera posibilidad de que el daño reclamado se debió al incumplimiento del médico de su obligación profesional. Ante las alegaciones de prueba nueva planteadas por Rodríguez-Rodríguez, el foro primario, correctamente razonó que era necesario presentar prueba pericial, pues, en efecto, la propia perito de los apelantes, concluyó que no surgían imputaciones de negligencia en contra de la Dra. Casado y el Dr. Ochoa. Así pues, coincidimos con el foro *a quo,* quien correctamente concluyó que procedía desestimar la causa de acción contra la Dra. Casado y el Dr. Ochoa. Lo anterior, pues la presentación de alegaciones de prueba nueva, <u>sin prueba pericial que la apoye,</u> no se sostienen al confrontarlas con la prueba pericial que sí exime de responsabilidad a la Dra. Casado y al Dr. Ochoa. En vista de lo anterior, coincidimos con el foro apelado que, ante la prueba pericial que eximía de responsabilidad a los doctores Casado y Ochoa comparada con la alegada prueba nueva que se pretendía presentar, procedía desestimar la causa de acción contra los referidos doctores. Consecuentemente, procedía desestimar también la causa de acción contra SNG, pues al no imputársele responsabilidad a los doctores, SNG tampoco es responsable.

Respecto al tercer señalamiento de error, luego de evaluar las disposiciones de la Ley 136-2006, *supra,* y la Ley 104-1955, *supra,* concluimos que el foro primario incidió en determinar que el Dr. Ochoa tenía inmunidad, conforme al Artículo 3(b) de la Ley 136, 2006, *supra.* El Artículo 7 de la Ley 136-2006, *supra,* lo que establece es que las limitaciones impuestas bajo la Ley de Pleitos contra el Estado, se extiende a los Centros Médicos Académicos Regionales y miembros de la facultad. Esto es, que les aplica la limitación de un máximo de $75,000 por daños sufridos por una persona y hasta $150,000 por daños y perjuicios causados a más de una persona o cuando sea más de una reclamación. Así, conforme resuelto por el Tribunal Supremo, la intención legislativa de dicho artículo fue establecer la aplicación de los límites de responsabilidad aplicables al Estado, no atribuirles inmunidad a los centros, estudiantes y su facultad[34]. Conforme determinó el Alto Foro, tanto los CMAR, estudiantes y miembros de la facultad, en casos constitutivos de impericia médico-hospitalaria, no les cobija una "inmunidad", sino un límite monetario a las cuantías que se le podría imponer, por lo que éstos pueden ser incluidos en una demanda sobre impericia médico-hospitalaria.[35] Ahora bien, en vista de que se desestimó la causa de acción contra el Dr. Ochoa, pues no se presentó prueba que demostrara que este incurrió en negligencia, el tercer señalamiento de error no afecta la disposición final del caso.

En vista de los fundamentos antes expuestos, procede confirmar la Sentencia apelada.

IV.

Por los fundamentos antes expuestos, se confirma la *Sentencia* apelada.

---

[34] Véase, *Rodríguez Figueroa v. Centro de Salud,* 197 DPR 876, 877 (2017).
[35] *Íd.,* pág. 890.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones